**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Liberty Towers, LLC. | : | |
| | : | |
| **Plaintiff**, | : | |
| | : | **Civil Action No.: 10-1666** |
| v. | : | |
| | : | |
| Zoning Hearing Board of the Township | : | |
| Lower Makefield, Bucks County, | : | |
| Pennsylvania, et al. | : | |
| | : | |
| **Defendants**. | : | |
| | : | |

<u>**MEMORANDUM OPINION**</u>

**Tucker, J.**                                                                            **August___, 2011**

        The parties have fully briefed cross motions for summary judgment.  Presently before the

Court is Defendant Nathan M. Edelstein's Motion For Summary Judgment (Doc. 25); Defendant

Lauren Templeton's Motion For Summary Judgment (Doc. 27)[1]; Defendant Lower Makefield

Township's Motion For Summary Judgment (Doc. 29); Plaintiff Liberty Towers, LLC's Motion For

Summary Judgment (Doc. 30); and all Responses in Opposition thereto.  (Docs. 31-34)  After careful

consideration of the parties submissions and exhibits thereto and for the reasons set forth below the

Court concludes that the Board's denial of Plaintiff's application for a use variance does not violate

the Telecommunications Act.  Specifically, the Court finds that (1) the Board's decision was

supported by substantial evidence and (2) the Board's decision did not prohibit, or have the effect of

prohibiting the provision of  wireless services.  Accordingly, the Court grants Defendant Lower

Makefield Township's Motion For Summary Judgment.

_____

        [1] Defendant Templeton relies on the brief and appendix filed by Co-Defendant Nathan Edelstein in
support of his Motion for Summary Judgment.

The instant action is an appeal of the Zoning Hearing Board of Lower Makefield Township's denial of Plaintiff's zoning applications, by which Plaintiff was seeking a use variance to construct a wireless communication facility in a R-3M Zoning District, a single family residential district.  The issue before the Court is whether the Zoning Hearing Board's denial of Plaintiff's application constitutes a violation of the Telecommunications Act of 1996, 47 U.S.C.§ 332(c) (2010).

## I.                     PROCEDURAL BACKGROUND

Plaintiff, Liberty Towers, LLC ("Liberty"or "Liberty Towers") asserts a claim against Defendant,  Zoning Hearing Board of the Township of Lower Makefield ("the Zoning Hearing Board" or "Board") pursuant to the Telecommunications Act of 1996, 47 U.S.C.§ 332(c) (2010) ("the TCA"or "the Act").  Liberty alleges that the Board's denial of Plaintiff's application for a use variance to construct a wireless telecommunication tower constitutes a violation of the TCA because it has the effect of prohibiting the provision of wireless communications service.  Additionally, Plaintiff alleges that the Board's denial was not supported by substantial evidence, was arbitrary, capricious and abuse of discretion and thus contrary to the requirements of section 332 (c)(7)(B)(iii) of the Act.

Plaintiff initiated the instant action with the filing of a Complaint on April 15, 2011. (Doc.1)  On May 6, 2010, Nathan Edelstein filed a Motion to Intervene as a defendant in the instant action. (Doc. 3)  Thereafter, on May 11, 2010, and May 12, 2010, Lauren Templeton and Lower Makefield Township each filed a Motion to Intervene as a defendant in this action.  (Docs. 4, 5)  By Order entered on June 12, 2010, the Court granted each of the respective motions.  (Doc. 8)  Defendant Templeton filed an Answer to Plaintiff's Complaint on June 25, 2010.  (Doc.10)

In response to Plaintiff's Complaint, Defendant Lower Makefield Township filed a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12 (b)(6) on June 18, 2010.  (Doc. 9).  On July

16, 2010, Defendant Edelstein filed a Motion to Dismiss For Lack of Jurisdiction Pursuant to Federal Rule of Civil Procedure 12(b)(1).  (Doc. 11)  On June 28, 2010, the Court entered an Order an accompanying memorandum denying the motions. (Docs. 17, 18).  After a Rule 16 Conference held on January 4, 2011, the Court issued a Scheduling Order in which it directed the parties to file cross motions for summary judgment.  (Docs. 23, 24)  The Court now addresses the pending motions.

## II.                              FACTUAL BACKGROUND

Liberty Towers is a limited liability company registered to do business within the Commonwealth of Pennsylvania.  (Compl. ¶ 1.)  Liberty Towers is in the business of constructing and operating wireless telecommunication facilities.  (Compl. ¶ 1.)  These facilities are used by Federal Communications Commission ("FCC") licensed providers of wireless services.  Defendant, Zoning Hearing Board is a political subdivision of Bucks County, Pennsylvania and is charged with the responsibility of approving or denying applications for use variances to construct wireless communication facilities.  Liberty Towers wishes to construct a one-hundred-and-fifty-foot monopole communications tower on the property known as the Brookside Swim Club.  (Compl.¶ 6.)  The Brookside Swim Club is located in a residential zoning district on Stony Hill Road, Yardley, Pennsylvania.

Pursuant to section 200-28A of Lower Makefield Township's zoning ordinance, a variance is required to permit certain areas, including the area selected by Plaintiff, to be utilized as a site for a wireless telecommunication facility.[2]  (Compl. ¶ 19.)  Accordingly, on July 14, 2009, Liberty Towers

---

[2] Section 200-97(A)(1)-(5) of the Township's Zoning Ordinance provides that a use variance may be granted if the applicant meets the following conditions:

> The Board shall hear requests for variances where it is alleged that the provisions of this chapter inflict unnecessary hardship on the applicant. The Board shall prescribe the form of application and require preliminary application to the Zoning Officer. The Board may grant a variance, provided that the following findings are made where relevant in a given case:

submitted a zoning application to the Zoning Hearing Board requesting a use variance to construct the wireless communications tower on the subject property.  (Compl. ¶¶ 6, 20.)  In support of its application, Plaintiff averred that both Sprint and T-Mobile seek to install communication antennas on the proposed facility.[3]  (Compl. ¶ 7.) Pursuant to licenses granted by the FCC, Sprint and T-Mobile are authorized to provide wireless communication services. (Compl. ¶¶ 8, 10.)  Said licenses require that both companies provide wireless communication services at a level sufficient to offer adequate service to the population within the licensed service areas — namely, Lower Makefield

---

1.      That there are unique physical circumstances or conditions, including irregularity, narrowness or shallowness of lot size or shape or exceptional topography or other physical conditions peculiar to the particular property and that the unnecessary hardship is due to such conditions and not to circumstances or conditions generally created by the provisions of this chapter in the neighborhood or district in which the property is located.

2.      That because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of this chapter and the authorization of a variance is therefore necessary to enable the reasonable use of the property.

3.      That such unnecessary hardship has not been created by the appellant.

4.      That the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located nor substantially or permanently impair the appropriate use or development of adjacent property nor be detrimental to the public welfare.

5.      That the variance, if authorized, will represent the minimum variance which will afford relief and the least modification possible of the regulation in issue.

(Lower Makefield Township's Mot. for Summ. J. 2-3)

[3] In both the application made to the Zoning Hearing Board and the Complaint filed in this Court, Plaintiff averred that both Sprint and T-mobile seek to install antennas on the proposed wireless communication facility.  (Compl. ¶ 7.)  However, it its motion for summary judgment Plaintiff avers that if, and when, the tower is completed, it will support the wireless communications antennas of T-Mobile. Plaintiff makes no mention of Sprint nor the company's previous desire to place a tower on the proposed facility.  Moreover, Liberty failed to present any testimony or evidence regarding a gap in coverage for Sprint during the public hearings held before the Zoning Hearing Board.

-4-

Township.[4]  (Compl. ¶ 11.)  Plaintiff alleges that both companies have identified an area in Lower

Makefield Township where there is a *significant gap* in service.  (Compl. ¶15)  A gap in service, is

an area not covered by wireless signals which results in dropped calls as callers enter the uncovered

area.  Nextel W. Corp. v. Unity Twp., 282 F.3d 257, 260 n1 (3d Cir. Pa. 2002).

The Zoning Hearing Board held four public hearings on Plaintiff's application for a use

variance on October 6, 2009, November 2, 2009, January 13, 2010 and on February 16, 2010.

(Compl. ¶ 21) (Board's Findings of Fact, Dec. and Order 1).  During these hearings, Liberty Towers

avers that it presented evidence in the form of testimony and exhibits demonstrating that T-Mobile

has *significant gaps* in its wireless communication service in Lower Makefield Township.  (Compl. ¶

22)  Specifically, Liberty Towers presented evidence from several persons accepted as experts by the

Board that the T-Mobile service available in the subject area was unreliable and the construction of

the proposed wireless telecommunication facility would allow T-Mobile to provide "adequate

service" to the residents of Lower Makefield Township pursuant to its FCC licensing requirements.

(Compl. ¶ 22)  Philip Burtner, P.E., a structural engineer provided testimony regarding the layout and

design of the proposed communications tower and its compliance with applicable regulations.  (Hr'g

Tr. 32: 4-23, Oct. 6, 2009) Through Burtner's testimony the Board confirmed that the proposed one-

hundred-fifty-foot tower constructed of galvanized steel would be as close as 400 feet to the nearest

residential dwelling.  See (Hr'g Tr. 28: 4-11; 48: 23-25, Oct. 6, 2009)  Burtner testified that in his

opinion the facility would have virtually no impact on traffic. (Hr'g Tr. 30: 22-23, Oct. 6, 2009).

---

[4]

    In order to retain its FCC license for a region, a licensee must achieve quality coverage (defined by the industry as the absence of "dropped" calls) for a certain percentage of the region's population within a certain number of years after the license was granted; if the licensee fails to do so it will forfeit its entire license.

Nextel W. Corp. v. Unity Twp., 282 F.3d 257, 260 (3d Cir. Pa. 2002).

Brian Seidel, a land use planner certified by the American Institute of Certified Planners also testified on behalf of Liberty and opined that Liberty's proposed use of the site was similar to the use of existing facilities. (Hr'g Tr. 69-103, Nov. 2, 2009) Seidel provided testimony concerning a balloon test conducted to demonstrate the height of the tower as it compared to its surroundings. According to the results of the balloon test, the tower would be visible to homeowners in and around the subject area. (Hr'g Tr. 82: 3-23, Nov. 2, 2009) Additionally, Seidel testified that it was his opinion that the proposed facility was the least intrusive alternative, however, he was unaware of what efforts T-Mobile made to acquire other sites.

Bassam Iskander, a radio-frequency engineer, accepted as an expert by the Board on the subject of radio-frequency engineering and the design and operation of wireless communication networks, provided testimony on behalf of Liberty Towers about the gap in coverage for T-Mobile cell phone use. Specifically, Mr. Iskander explained the process conducted by T-Mobile and other wireless carriers to determine whether there is a gap in service in a specific area. In doing so, Mr. Iskander explained that T-Mobile relies on a propagation tool, a software program designed to determine existing network conditions by recording signal strength. (Hr'g Tr. 19: 3-11, Jan. 13, 2010) Iskander explained that the propagation tool's results are tested using a drive test data wherein technicians drive through the subject area and measure T-mobile's wireless communication signal strengths. (Hr'g Tr. 19: 7-24, Jan. 13, 2010) During Iskander's testimony Liberty introduced several exhibits—namely maps, depicting the propagation tool's analysis of the wireless service available in the subject area. Said maps depicted several white areas, which Iskander explained were areas where a person would be unable to reliably place a call.[5] (Hr'g Tr. 25: 10-24, Jan. 13, 2010) When asked to

---

[5] In making these assessments Iskander relied on the industry standard for reliability as there is no legal or reliable standard for reliable wireless communication service. (Hr'g Tr. 56: 23-25, Jan. 13, 2010).

further expound on the service available in the "white areas," Iskander testified that "it depends on where you are standing.  If you're in a car – if you are outdoors you might have somewhat fair coverage here. . . . [But,] certainly not good coverage."  (Hr'g Tr. 28: 16-25, Jan. 13, 2010)

Plaintiff avers that the white areas encompass a heavily traversed area that includes a portion of Interstate 95, a SEPTA commuter rail line to Philadelphia, and portions of several residential subdivisions. (Pl.'s Br. Summ J. 6) Plaintiff introduced another map depicting the wireless coverage in the subject area assuming the proposed facility was constructed.  Iskander testified that in his opinion T-Mobile would be able to provide reliable wireless communications services if the proposed tower were constructed. (Hr'g Tr. 42: 12-22, Jan. 13, 2010)

Intervenor Defendant, Templeton, opposing the grant of the variance, testified that she lived in a community adjacent to the proposed site and is a T-Mobile cell phone user, as is her husband. (Hr'g Tr. 6: 12-13, Feb. 16, 2010)  Templeton testified that she was able  to place calls on her T-Mobile cell phone, both inside and outside her home on several occasions without incident and without dropped calls.  (Hr'g Tr. 15: 3-24, Feb. 16, 2010)  In fact, Templeton characterized her cell phone service as good and dependable.  (Hr'g Tr. 15: 18-24, Feb. 16, 2010) Moreover, Templeton testified that her husband who often uses his cell phone for business, frequently uses his cell phone in making and receiving phone calls from their basement and has been able to do so without incident and without dropped calls.  (Hr'g Tr. 16: 4-19, Feb. 16, 2010) Additionally, Templeton testified that she had a clear and unobstructed view of the balloon test from her home.  (Hr'g Tr. 9: 1-9, Feb. 16, 2010).  According to Templeton the construction of the tower would have a negative impact on her ability to enjoy her home as it would be visible from virtually every room in the back of her home and would deter her from allowing her children to play outside as much as they would otherwise. (Hr'g Tr. 12: 16-25, Feb. 16, 2010)

On February 16, 2010, after reviewing the evidence, the Board concluded that the quality of

existing cellular service within the subject area was sufficient, and that there was therefore no

legitimate need for the proposed wireless communications facility.  Accordingly, the Zoning Hearing

Board issued a written decision and order denying Liberty's application for a use variance.  (Compl.

¶ 24).  Therein, the Board described the testimony and evidence presented at the hearings.  See

(Board's Decision. Doc. 29 Ex. 2) In addition to finding that Plaintiff's proposed cell site would not

eliminate the coverage gap in Lower Makefield for T-Mobile or other licensed cell carriers (Findings

Nos. 6-7), the Board made several specific findings of fact including inter alia:

21.    The appellant called Bassem Iskander, a radio frequency engineer who testified
        as an expert on radio frequency engineering and the design and  operation of wireless
        communication networks.

22.    The appellant introduced Exhibit A-11 which is a map depicting T~Mobile
        existing coverage without the proposed site.

23.    Exhibit A-11 was prepared by Mr. Iskander  using propagation software which
        records signal strengths throughout the network.

24.    Exhibit A-11 is green, yellow and white in color, with the white area depicting
        unreliable coverage.

25.    The appellant introduced Exhibit A-12 which depicts the same geographic area
        as Exhibit A-11and depicting coverage assuming the proposed site being operational.

26.    Both Exhibit A-11 and A-12 depict the proposed site with a red dot titled IBU8173A.

27.    Mr. Iskander used the the same propagation tool for A-12 that he used for A-11.

28.    Exhibit A-12 depicts the elimination of a substantial portion of the white (unreliable
        coverage) area shown on Exhibit A-11.

29.    Exhibits A-11 and A-12 only apply to the T-Mobile signal and not Sprint/Nextel.

30.    Mr. Iskander testified that he was not aware of how many residents are affected
        by the unreliable area depicted in white on Exhibit A-11.

31.    Mr. Iskander testified that the yellow areas depicted in Exhibits A-11 and A-12
        show reliable in-vehicle coverage.

32.    Mr. Iskander attempted to define reliable in-vehicle service as corresponding to
        a signal level set by the industry below which cell phones will not be able to detect

that signal and will not be able to make a reliable call. He went on to state that this means that, "you may be able to make one every once in a while."

33.     Mr. Iskander indicated that the time of the year, phone manufacturer and natural and manmade obstructions; among other things, all affect signal strength.

34.     The essence of Mr. Iskander's testimony concerning reliability of signal strength is in actuality a function of the propagation software, industry benchmarks and complicated mathematical equations.

35.     Mr. Iskander testified that his opinion of reliable coverage as depicted in white on Exhibit A-11 and A-12 would not change even if, hypothetically speaking, an individual driving in a car in the white area made in one day 100 successful calls out without interruption and received 50 calls in without interruption, unless that hypothetical individual were standing in the lowest spot in the terrain, in a building in the white area.

42.     Mr. Edelstein presented Exhibit E-2 which is a T-Mobile personal coverage- voice document dated January 12, 2010 depicting Lower Makefield and the personal coverage for voice.

43.     Mr. Edelstein introduced Exhibit E-3 which depicts an area substantially similar to the area depicted on Exhibit A-11 and again indicates the T-Mobile personal coverage for voice in that area.

44.     Both Exhibits E-2.and E-3 depict various levels of coverage based on a color scale.

45.     Neither Exhibit E-2 nor Exhibit B-3 depict any area in white which would be coverage classified as none.

(Board's Findings of Fact 3-5)

The Board also provided a brief description of the standards required to grant a use variance.

(Board.'s Decision 6)  It then denied Plaintiff's request for a variance reasoning that the evidence presented by Plaintiff showed that there were still white (unreliable coverage) areas on the map of the proposed site, even after installation of the communication tower.  Id.  The Board went on to note that the decision to deny the variance turned on the applicable definition of reliable coverage. Id.

The Board reasoned that because calls were able to be both made and received while in the white area, reliable coverage could not be characterized as nonexistent.  See id.  Also integral to the Board's decision was the testimony given by Mr. Seidel, Plaintiff's land planning expert, that the subject location could be used as zoned and could continue to be used as zoned absent the grant of a variance.  Id. at 7.  Finding that there was no evidence of hardship absent the grant of the variance, the Board concluded there was no legal justification upon which it could rely in granting Plaintiff's application for a use variance.  Id.  Despite making this decision the Board conceded that wireless coverage would be improved if the communication facility was installed.  Id.

On April 15, 2010, Liberty appealed the Zoning Hearing Board's denial of its application for a variance in the Bucks County Court of Common Pleas.  At this same time, Liberty Towers commenced an action in this Court, asserting that the denial of its application for a use variance was a violation of the TCA.  Count I of Plaintiff's Complaint alleges that the Board's denial of Liberty Tower's application had the effect of prohibiting the provision of personal wireless service, contrary to the requirements of 42 U.S.C. § 332(c)(7)(B)(i)(II).  (Compl. ¶ 31)  Count II of Plaintiff's Complaint alleges that the Board violated the requirement of 47 U.S.C.§ 332(c)(7)(B)(iii), in that the Board's decision was not supported by substantial evidence contained.  (Compl. ¶ 34)

**III.**                                      **LEGAL STANDARD**

Summary judgment is appropriate where the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986);  Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 501 (3d Cir. 2008).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (noting

that no triable issue exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). See also Dee v. Borough of Dunmore, 549 F.3d 225, 229 (3d Cir. 2008). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. See Celotex, 477 U.S. at 327 (1986).

Once the movant has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). Under Rule 56(e), the opponent must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. See Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007). If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249; Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and inferences in the light most favorable to the non-movant. See Matsushita, 475 U.S. at 587; Horsehead Indus., Inc. v. Paramount Commc'ns, Inc., 258 F.3d 132, 140 (3d Cir. 2001). The court must award summary judgment on all claims unless the non-movant shows through affidavits or admissible evidence that an issue of material fact remains. See, e.g., Love v. Rancocas Hosp., 270 F. Supp. 2d 576, 579 (D.N.J. 2003); Koch Materials Co. v. Shore Slurry Seal, Inc., 205 F. Supp. 2d 324, 330 (D.N.J. 2002).

III.                                    **DISCUSSION**

       A.       The Telecommunications Act

The United States Court of Appeals for the Third Circuit has described the TCA as an "overhaul of the federal regulation of communications companies." Omnipoint Communications Enters. v. Newtown Township, 219 F.3d 240, 242 (3d Cir.2000). Congress enacted the TCA to provide "'a pro-competitive, de-regulatory national policy framework designed to rapidly accelerate private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening  all telecommunications markets to competition.'" APT Pittsburgh Ltd. P'ship v. Penn Twp., 196 F.3d 469, 473 (3d Cir. 1999) (quoting H.R. Conf. Rep. No. 104-458 (1996), reprinted in 1996 U.S.C.C.A.N. 10, 1124)).  To that end, Congress set out to reduce "the impediments imposed by local governments upon the installation of facilities for wireless communication, such as antenna towers." City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 115, 125 S. Ct. 1453, 161 L. Ed. 2d 316 (2005).  The Act limits "the ability of local authorities to regulate and control the expansion of telecommunications technologies" by allowing courts to "review telecommunication zoning denials more closely than standard zoning decisions." Newtown Township, 219 F.3d at 242-43.  Local zoning authorities, however, retain a considerable amount of power under the Act.  Section 332(c)(7)(A) provides that:

> Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of  personal wireless service facilities.

47 U.S.C. § 332(c)(7)(A).  Any person adversely affected by local regulators' final action on a placement, construction, or modification application may seek judicial review in any court of competent jurisdiction.  See id. § 332(c)(7)(B)(v).

In this case, Liberty Towers argues that the Board's denial of Liberty's application violates the TCA because it "has the effect of prohibiting the provision of personal wireless services," contrary to the mandates of 47 U.S.C. § 332(c)(7)(B)(i)(II), and was not based on substantial

-12-

evidence, was arbitrary and, capricious, and an abuse of discretion, thus, a violation of § 332(c)(7)(B)(i)(iii) of the Act.[6]  Upon review of the record and  the parties' submissions,  the Court concludes that Liberty Towers has not proven a violation of the TCA.

      B.      **Substantial Evidence Standard**

At issue here is whether the Board's Decision was supported by "substantial evidence" contained in a written record as required by the Act.  47 U.S.C. § 332(c)(7)(B)(iii).  "The TCA's substantial evidence test is a procedural safeguard which is centrally directed at whether the local zoning authority's decision is consistent with the applicable zoning requirements." Omnipoint Communications MB Operations, LLC v. Town of Lincoln, 107 F. Supp. 2d 108, 115 (D. Mass. 2000)).  Congress intended that the substantial evidence requirement of the TCA be equivalent to "'the traditional standard used for judicial review of agency actions.'" Cellco Pshp. v. Hess, 1999 U.S. Dist. LEXIS 3745 (E.D. Pa. Mar. 30, 1999) (citing Bellsouth Mobility Inc. v. Gwinnett County, 944 F. Supp. 923, 928 (N.D. Ga. 1996).  "The test is fairly deferential to the opinion of the zoning authority and a reviewing court is not free to substitute its own judgment for that of the local authority, even if the reviewing court would have decided the issue differently as an original matter." Omnipoint Communications, 107 F. Supp. 2d at 115. (citations omitted)  A reviewing court will uphold a local zoning board's authority so long as there is "more than a mere scintilla" of evidence Alexander v. Shalala, 927 F. Supp. 785, 791 (D.N.J. 1995) (defining substantial evidence as "more than a mere scintilla, but may be less than a preponderance") (citation omitted), aff'd, 85 F.3d 611 (3d Cir. 1996).  See also Pierce v. Underwood, 487 U.S. 552, 565, 101 L. Ed. 2d 490, 108 S. Ct.

---

   [6] A local zoning authority's written decision must "(1) be separate from the written record; (2) describe the reasons for the denial; and (3) contain a sufficient explanation of the reasons for the denial to allow a reviewing court to evaluate the evidence in the record that supports those reasons." New Par v. City of Saginaw, 301 F.3d 390, 395-96 (6th Cir. 2002).

-13-

2541 (1988) (noting that a "large or considerable amount of evidence" is not required).

In applying the substantial evidence standard to evaluate a local zoning authority's decision, a court must consider the record in its entirety,  including contrary evidence.  Penobscot Air Servs. v. FAA, 164 F.3d 713, 718 (1st Cir. 1999)  "However, the possibility of drawing two inconsistent conclusions does not mean that the zoning authority's decision is not supported by substantial evidence . . . . "  Omnipoint Communications, 107 F. Supp. 2d at 115 (citing Penobscot Air, 164 F.3d at 718)  The relevant inquiry under the substantial evidence standard is "whether a zoning authority's denial is based on 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' or whether it is based upon unsubstantiated conclusions.'"  Omnipoint Communications, 107 F. Supp. 2d at 115 (quoting Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 494 (2d Cir. 1999)).  Applying this standard to the facts of the case at bar, the Court concludes that reasonable minds would find adequate evidentiary support for the Board's denial of Plaintiff's application.

C.     Liberty Tower's Motion for Summary Judgment

Liberty Towers argues that it is entitled to summary judgment for the following two reasons: (1) the decision by the Zoning Hearing Board to deny Plaintiff's request for zoning relief is not supported by "substantial evidence," as required by section 332(c)(7)(B)(iii) of the TCA; and (2) the Zoning Hearing Board's decision had the effect of prohibiting wireless service in Lower Makefield Township, in violation of section 332(c)(7)(B)(i)(II).

In support of its first argument, Liberty argues that the Board's decisions fails to adhere to the substantial evidence standard in four distinct ways:

1.     The decision ignores key evidence and fails to reconcile it with the evidence on which the decision is based. (Pl. Br. in Supp. of Mot. for Summ. J. 11.)

2.     The decision departs from the substantial evidence standard because it seizes upon one part of Mr. Iskander's testimony without reconciling it with the remainder of his testimony and

-14-

the other evidence produced by Liberty.  (Pl. Br. in Supp. of Mot. for Summ. J. 12.)

3.      The decision fails to comply with the substantial evidence standard because it rejects Mr. Iskander's expert testimony regarding the unreliability of T-Mobile's coverage without explanation.  (Pl. Br. in Supp. of Mot. for Summ. J. 13.)

4.      The decision falls short of the substantial evidence standard because it rejects Mr. Iskander's uncontested expert testimony in favor of the Board's own credibility determinations, speculation and lay opinion.  (Pl. Br. in Supp. of Mot. for Summ. J. 14.)

Secondly, Plaintiff argues that the Board's decision has the effect of prohibiting the provision of personal wireless services in Lower Makefield Township.  (Pl. Br. in Supp. of Mot. for Summ. J. 15.)  Liberty argues that it has demonstrated the existence of a significant gap in wireless coverage in the subject area, and that the existence of such gap is determined from the perspective of the applicant wireless carrier, not an individual user of wireless telecommunications services. (Pl. Br. in Supp. of Mot. for Summ. J. 17, 19.)  In support, it contends that a showing that T-Mobile presently experiences a significant gap in its coverage in the Township, several miles long and a half-mile wide, covering Interstate 95, a SEPTA commuter line and a number of residential subdivisions, is sufficient. (Pl. Br. in Supp. of Mot. for Summ. J. 21.)  Further, Liberty argues, evidence that an individual user is able to access the national telephone network from within the gap is not relevant to whether the gap is significant; the proper inquiry is whether T-Mobile experiences a gap in its own coverage, regardless of whether other carriers provide service in the same area. (Pl. Br. in Supp. of Mot. for Summ. J. 23.)  Finally, Liberty argues that its proposed means of filling the significant gap in coverage is the least intrusive on the values the denial of its application sought to serve. (Pl. Br. in Supp. of Mot. for Summ. J. 23-24.)

C.      Lower Makefield Township's Motion For Summary Judgment

Defendant, Lower Makefield Township, argues that an examination of the record reveals that

Liberty has completely failed to establish any of the five criteria for obtaining a use variance. (Def. Township Mot. for Summ. J. 10.)  The Township argues that Liberty made no legitimate effort to establish that the property cannot be used as zoned or that continuing with the same use would present a hardship. (Def. Township Mot. for Summ. J. 10.)

The Township further argues that Liberty's contention, that there was a gap in service for T-Mobile, is an attempt to override the Township's zoning ordinance in favor of the provisions of the Telecommunications Act. (Def. Township Mot. for Summ. J. 11.)  In support, it argues that, even assuming Liberty established that T-Mobile had a gap in coverage, Liberty failed to present any testimony regarding a gap in coverage for Sprint, another provider of telecommunications coverage in the area. (Def. Township Mot. for Summ. J. 11.)  The Township further argues that Liberty must meet the burden of proving that a cell tower is needed in the subject area by showing that, otherwise, cell phone companies could not provide telecommunications services. (Def. Township Mot. for Summ. J. 13.)  It argues that once a provider has some general coverage in an area, which it claims T-Mobile provides, even if certain "dead zone" holes exist, there is no significant gap. (Def. Township Mot. for Summ. J. 13.)

Turning to the substance of the evidence presented in support of Liberty's contention that there is a gap, the Township attacks the testimony presented by Mr. Iskander's, Liberty's expert on radio-frequency in several ways.  First, the Township argues that Iskander's testimony never made an attempt to quantify or calculate actual calls but merely relied on a "drive test" performed by unidentified technicians.  Moreover, the Board was provided with a summary of said tests and not the actual data.  Secondly, the Township asserts that Iskander was unaware of the number of residents or homes allegedly affected by the 'gap'.  Third, the Township argues that Liberty employed a subjective standard to determine reliability, a standard which was chosen by T-Mobile.  According to the Township said standard was created by the telecommunication industry and is neither a legal nor an

administrative standard.  Last, Iskander in fact acknowledged that there is reliable service outdoors at the subject location.  (Def. Township Mot. for Summ. J. 14.)  The Township contends that Mr. Iskander's testimony simply establishes that there are dead spots in the disputed area, which does not equate to a significant gap in coverage.

The Township also argues that, even if Liberty had demonstrated a significant gap in coverage, that alone does not justify a finding that the Board had committed an error of law. (Def. Township Mot. for Summ. J. 15.)  It argues that the denial of an application for a particular site is not enough to prove that there has been a violation of the "effects clause" of the TCA, Liberty had a duty to develop the record to demonstrate that they had made a full effort to evaluate other available alternatives in the Township, and to establish that those alternatives were not feasible to service its clients, which the Township claims Liberty failed to do. (Def. Township Mot. for Summ. J. 15-16.)

D.  Intervenor Defendant Edelstein's Motion for Summary Judgment Joined by Intervenor Defendant Templeton

Intervenor Defendant, Edelstein argues that Plaintiff has failed to satisfy Lower Makefield Township's zoning ordinance requirements for a use variance, has presented no evidence that there was a significant gap in Sprint's cell phone coverage, and has failed to prove that T-Mobile has been prohibited from providing cell phone service in the "white area" and, to the contrary, T-Mobile's cell phone service in the "white area" is strong and reliable.

In support of his first basis for summary judgment, Edelstein argues that Plaintiff has failed to prove that: (1) there are unique physical circumstances or conditions and that the unnecessary hardship is due to such conditions; (2) that because of such conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the zoning ordinance and the authorization of a variance is therefore necessary to enable reasonable use of the property; (3) that such unnecessary hardships have not been created by the appellant; (4) and that the variance, if

-17-

authorized, would represent the minimum variance which will afford relief and the least modification possible of the regulation in issue.  (Def. Edelstein Mot. for Summ. J. 13.)  Edelstein further argues that the consideration of adverse aesthetic impacts on a residential neighborhood is relevant in cell tower cases. (Def. Edelstein Mot. for Summ. J. 25-27.)

Edelstein argues that T-Mobile does provide service within the alleged "significant gap." (Def. Edelstein Mot. for Summ. J. 16-23, 32-34.)  Edelstein also argues that no witness was provided, nor evidence presented, that Sprint does not provide coverage within the gap area, but does not provide any witnesses or evidence of his own to the contrary. (Def. Edelstein Mot. for Summ. J. 27-28.)  Edelstein contends that, pursuant to explicit FCC regulations and the Courts of Appeal, localized areas allegedly receiving lower signal strength, located within a community where service is provided, are specifically presumed to have service and do not constitute a significant gap in service. (Def. Edelstein Mot. for Summ. J. 29-31.)  Edelstein reiterates the Township's arguments that mere dead spots do not constitute a significant gap in coverage, that Plaintiff must demonstrate that it has made a full effort to evaluate other available alternatives, and that the Plaintiff must use the means least intrusive on the values that the denial sought to serve. (Def. Edelstein Mot. for Summ. J. 34-36.)

E.     The Board's Decision Was Supported by Substantial Evidence

The Court finds that the Board's decision to deny Liberty's application for a use variance to construct a the wireless communication facility in a residential zone was supported by substantial evidence.  The Court's decision does not turn on any single factor that the Board may have found weighed against approving the proposed facility.  The Board considered the evidence presented by Liberty's witnesses including that provided by Mr. Bassam Iskander, Liberty's radio-frequency expert, and concluded that Liberty failed to satisfy the requirements for a use variance.   In making this conclusion, the Board reasoned that Liberty's contention that T-mobile has a "significant gap" in

service rests solely on a subjective standard set by the very industry seeking to utilize the proposed tower.

Here, Intervenor Defendant Templeton testified that she and her husband reside in a community adjacent to the proposed site and are able to both place and receive calls from their home without incident.  Of particular import to the Board's decision was the evidence and testimony that was notably absent from the hearing.  For example, in its motion for summary judgment, the Township points out that Seidel, Liberty's land use planning expert failed to provide any testimony to support the contention that the first three requirements of the Township's zoning ordinance would be satisfied.   Namely — Mr. Seidel did not contend in any way that there was any unique physical circumstances or conditions, irregularities, narrowness or shallowness of the lot size or shape or any exceptional topography or other physical conditions peculiar to this particular property.  Also, Mr. Seidel did not assert that  there was no possibility that the property could be developed in conformity with the Zoning Ordinances because of physical circumstances or conditions.  Moreover, notably lacking was any testimony that there was an unnecessary hardship associated with the subject area such that a variance needed to be granted.

Additionally, the Board was not persuaded that there was a "significant gap" in reliable service as the standard used by Liberty in advancing this argument, is a subjective one, established by those in the wireless service industry.  Furthermore, Mr. Iskander, Liberty's expert on radio-frequency conceded that there was no agreed-upon definition of "reliability."  Additionally, the Board was influenced by the fact that Liberty did not present the actual data from the reliability tests but rather introduced a summary of said tests which appeared in the form of two maps depicting cell phone coverage in the subject area, one with the proposed tower and one without.  See  (Hr'g Tr. 66: 10-22, Jan. 13, 2010)  During Iskander's testimony the Board learned that he did not quantify the actual calls that were received, the number of calls that were not received nor how often calls were

"dropped."   Furthermore, T-mobile failed to present any evidence of the number of residents nor homes that were affected by the alleged gap in wireless service.  (Hr'g Tr. 68: 16-21, Jan. 13, 2010) Additionally, Based upon Iskander's testimony and the other evidence introduced at the hearing the Board reasoned that there was insufficient evidence to support Liberty's contention that there was a significant gap in service absent the grant of a use variance for construction of a tower.

Moreover, the Board properly considered the objections of local residents who opposed the construction of Liberty's proposed wireless tower on the grounds that it would be aesthetically unappealing and inconsistent with the residential character of the neighborhood, and would therefore likely lead to declining property values in the area.  In fact, the Board heard testimony from James Webb, a residential appraiser who testified that the proposed facility would cause a serious detriment to the value of the homes in the subject area.  (Hr'g Tr. 26: 3-11, Feb. 16, 2010)   According to Webb, cell phone towers are perceived to be a health risk and a sight problem. (Hr'g Tr. 26: 12-14, Feb. 16, 2010) Because of these perceptions, Webb opined that most prospective homeowners will decline to purchase a home next to a tower whenever possible.  (Hr'g Tr. 26: 22-24, Feb. 16, 2010) Such objections to the proposed facility are clearly part of the record and were appropriately considered by the Board when it denied Liberty's request for a use variance.  Where a residential neighborhood is involved, courts have held that residents' concerns that telecommunications towers will lower property values are reasonable objections that the local Board is expected to consider. See Cellco P'ship v. Bd. of Supervisors, No. Civ. A. 7:04 CV 00029, 2004 WL 3113188, at *5 (W.D.Va. July 2, 2004).

The Court finds that the testimony and evidence introduced during the hearing supports a finding that the Board's decision was based on substantial evidence. The Board made its decision on both the weight and substance of the evidence introduced during the hearings and as a result of the evidence that was lacking.

F.    The Zoning Hearing Board's Denial of Liberty's Application Does Not Prohibit Nor

Have the Effect of Prohibiting the Provision of Wireless Services

Finally, Liberty asserts that the Board's decision violated § 332(c)(7)(B)(i)(II) of the Act, which provides that local zoning authorities "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." Id. Yet, again, this Court does not agree.  The TCA "does not define what constitutes prohibitive effect." Nextel, 282 F.3d at 265.  However, the Third Circuit, has set forth a two-pronged inquiry for evaluating whether a cellular provider has demonstrated a violation of the TCA's "effect of prohibiting" limitation on local zoning authority.  First, a cellular service provider "must show that its facility will fill an existing *significant gap* in the ability of remote users to access the national telephone network." APT, 196 F.3d at 480 (emphasis added). "Because the  relevant gap in the significant gap inquiry is a gap in the service available to remote users, providers must include evidence that the area the new facility will serve is not already served by another provider."  American Cellular Network Co., LLC v. Upper Dublin Tp. 203 F.Supp.2d 383, 389 (E.D.Pa.,2002) (internal quotations and citations omitted)

In Cellular Tel. Co. v. Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus, 197 F.3d 64, 70 (3d Cir.1999), the Third Circuit explained that a "gap" in personal wireless services exists "when a remote user of those services is unable either to connect with the land-based national telephone network, or to maintain a connection capable of supporting a reasonably uninterrupted communication." Id. at 70.  The Third Circuit did not however opine on what constitutes a "significant gap" in wireless service.  In American Cellular Network Co.,the district court reasoned that "[a]lthough there surely can be no hard-and-fast percentage of failed calls to define a significant gap, the Court concludes that a line of demarcation falling somewhere between 1.96% and five-to-seven percent is a reasonable interpretation of the TCA."  American Cellular Network Co.,203 F.Supp.2d at 394.

The second prong of the "effect of prohibiting" inquiry under the TCA requires a cellular provider to demonstrated "that the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve." APT, 196 F.3d at 480.  To satisfy this prong, the cellular provider must show "that a good faith effort has been made to identify and evaluate less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative systems designs, alternative tower designs, placement of antennae on existing structures, etc." Id.

> Cases in this Circuit evaluating whether a cellular provider has established a 'significant gap' demonstrate that determining whether a gap in service is significant involves at least two sub-questions." . . . [First, t]he Court must ask: has the cellular provider established that the quality of cellular service is sufficiently poor so as to rise to the level of a 'significant' gap? . . . "The second question relates to the scope of the gap-that is, how many users are affected by the gap, or how large an area is in the gap. The Court must ask: has the cellular provider established that the purported gap in service affects a large enough number of users so as to constitute a 'significant' gap?

New Cingular Wireless PCS, LLC v. Zoning Hearing Bd. of Weisenberg Tp.  2009 WL 3127756, at * 7  (E.D.Pa. 2009).

In attempt to establish that there is a "significant gap" in wireless service in the subject area, Liberty Towers relied on the testimony of Mr. Bassam Iskander, Liberty's radio-frequency engineer. Iskander's testimony focused on a "drive test" conducted with a propagation software tool.  Iskander explained that the results of the drive test demonstrated that there were pockets of areas with unreliable service, namely, white areas.  Applying the two part inquiry here, the Court finds that Liberty Towers failed to demonstrate that the quality of wireless service was sufficiently poor so as to warrant a finding that there is a "significant gap" in wireless service.  Liberty Towers did not

present any data quantifying the number of dropped calls that occur within the subject area.  See

Omnipoint Communications Enters. v. Zoning Hearing Bd. of Easttown Township, 189 F.Supp.2d

258, 263-65 (E.D.Pa. 2002)(analyzing number of dropped calls, instances of no service, and signal

strength); Cellular Tel. Co. v. Zoning Bd. of Adjustment of Borough of Harrington Park, 90

F.Supp.2d 557, 565 (D.N.J.2000) (analyzing percentage of dropped calls).  Rather, unlike Plaintiffs

in American Cellular Network Co., Omnipoint Communications and  Harrington Park, Liberty did

not introduce any information demonstrating the percentage of dropped calls or the call failure rate.

However, Liberty presented two maps one, depicting the "white areas" as they currently existed and

the other depicting the service that would be available if Liberty were allowed to construct the

proposed tower.  This summary did not present actual data but merely a summary of the drive test

data.  The existence of a dead spot in any given area does not automatically equate to a violation of

the TCA.  "The TCA does not require that wireless services provide one hundred percent (100%)

coverage in a given area, and in recognition of this, federal regulations contemplate the existence of

"dead spots"defined as "small areas within a service area where the field strength is lower than the

minimum level for reliable service."  New Cingular Wireless PCS, LLC,  2009 WL 3127756, at * 8

(citing 47 C.F.R. § 22.99).

   Without a percentage or a numerical value this Court cannot say that Liberty established that

there is a significant gap in service in Lower Makefield Township. The Court finds it necessary to

note that Liberty's contention that T-mobile experiences a "significant gap" in service cannot in an of

itself trigger a violation of the TCA's "effect of prohibiting" provision as "the significant gap inquiry

requires a showing that **all providers** experience a gap in service." New Cingular Wireless PCS,

LLC, 2009 WL 3127756, at * 8 (emphasis added).  Finding that Liberty has failed to established the

first prong of the inquiry the Court declines to address the second prong.  The Board's decision to

deny Liberty's request for a use variance was in no way a violation § 332(c)(7)(B)(i)(II).  The

decision in question was in no sense a blanket prohibition, but was an individual zoning decision on a particular area.

## <u>CONCLUSION</u>

Having found that Defendant Zoning Hearing Board  has not violated any of the provisions of the TCA, the Court will grant Defendant Lower Makefield Township's motion for summary judgment and will, accordingly, deny Plaintiff's motion.


An appropriate Order follows.


**BY THE COURT:**

**/s/ Petrese B. Tucker**
_____
**Hon. Petrese B. Tucker, U.S.D.J.**